*In re* GILBERTO SALAS DAVIS.

*Número:* AB-95-113 *Resuelto:* 19 de mayo de 1998

*Carlos Lugo Fiol, Procurador General, y Cynthia Iglesias Quiñones, Procuradora General Auxiliar,* en informe; *Carmen H. Carlos,* Directora de la Oficina de Inspección de Notarías, en informe; *Juan Arvelo Toledo, pro se; Gilberto Salas Davis, pro se.*

PER CURIAM: Juan I. Arvelo Toledo presentó una queja contra los notarios César Vélez González[1] y Gilberto Salas Davis.

Con vista a los informes de las Oficinas de Inspección de Notarías y del Procurador General, le concedimos al licenciado Salas Davis, mediante nuestra Resolución de 21 de noviembre de 1997, un término para que mostrara causa por la cual no deberíamos disciplinarlo "por su falta de cuidado y pobre desempeño notarial en el otorgamiento de la Escritura Núm. 46 del 9 de julio de 1992", sobre la *compraventa* de una propiedad en el barrio Dominguito, Arecibo.

Con el beneficio de su comparecencia, resolvemos. Expongamos los hechos que la originan.

I

Carmen Milagros Gil Torres contrató al licenciado Vélez González para la tramitación de la declaratoria de herederos de su padre fallecido Anastacio Gil Álvarez.[2] Gil Álva-

---

[1] El licenciado Vélez González falleció. Sólo ejercemos nuestra jurisdicción disciplinaria sobre el licenciado Salas Davis.

[2] Según la *certificación* expedida por el licenciado Vélez González el 7 de julio de 1992, dicha declaratoria estaba lista para presentarse ante el tribunal. Conforme a sus términos, sus herederos eran: Orlando, Israel, Luz María, Juan, Monserrate, Félix Roberto, Antonio, Carmen Milagros Gil Torres y la viuda, Genoveva Torres, esta última en cuanto a la cuota del usufructo viudal. En la misma certificación aclara que Israel Gil vendió sus derechos hereditarios a Carmen Milagros Gil Torres.

El notario Salas Davis alega que no vio dicha certificación hasta el 11 de diciembre de 1995 y que las partes le ocultaron la existencia del procedimiento hereditario.

rez y su esposa Genoveva Torres Rodríguez poseían, entre sus bienes, una propiedad en el barrio Dominguito de Arecibo, *la cual no estaba inscrita en el Registro de la Propiedad.*

El 23 de mayo de 1986 Carmen Milagros Gil Torres, coheredera, mediante la Escritura Núm. 38 de Compraventa de Derechos otorgada ante el notario Vélez González, compró todos los derechos y las acciones *sobre la mitad ganancial* correspondiente a su madre Genoveva, incluso su cuota usufructuaria. También, mediante la Escritura Núm. 41 de 12 de junio de 1992 otorgada ante el mismo notario, compró a su hermano Israel Gil Torres todos sus derechos y acciones sobre la herencia.

El 19 de junio de 1992, mediante la Escritura Núm. 43 ante el mismo Vélez González, Carmen Milagros confirió al Sr. Edgardo Gil Álvarez una *Escritura de Poder Especial* para enajenar, hipotecar, gravar, vender y poder disponer de la propiedad del barrio Dominguito, *"como si fuera la misma Carmen Milagros Gil Torres"*. (Énfasis suplido.) Escritura Núm. 43 de 19 de junio de 1992. En el mismo *poder* se le autorizó al apoderado a "comprar, adquirir y en cualquier forma pagar la adquisición de todo o en parte de derechos y acciones de dicha propiedad descrita y que aún pertenezcan a alguno de los herederos de Don Amastacio [sic] Gil Álvarez". Íd. *Surge claramente del documento que la participación de otros coherederos no se había adquirido aún, por lo que la poderdante no era la única propietaria del bien en cuestión. Además, surgía de la descripción del inmueble que no estaba inscrito.*

Así las cosas, aproximadamente tres (3) semanas después —el 9 de julio de 1992— el apoderado Gil Álvarez compareció ante el notario Salas Davis y, mediante la Escritura Núm. 46, *vendió la totalidad del inmueble al quejoso Arvelo Toledo y su esposa Luz María López Soto*. Se expresó en la escritura que Carmen Milagros adquirió la

propiedad mediante su compra a Genoveva Torres Rodríguez. Además, a pesar de consignar que la propiedad no estaba inscrita, el notario Salas Davis advirtió a los compradores —quejosos— la conveniencia de realizar un estudio registral de título. A la vez, se declaró en la escritura que "la parte COMPRADORA [quejosa] manifestó que el estudio de título lo había realizado personalmente".

## II

Como correctamente se expone en los Informes de las Oficinas de Inspección de Notarías y del Procurador General, al 9 de julio de 1992 la vendedora Carmen Milagros Gil Torres no *era dueña de la totalidad* de la finca. Poseía la mitad gananacial y la cuota usufructuaria comprádale a Genoveva Torres Rodríguez. También era acreedora de su propia participación, y de la adquirida a su hermano Israel, sobre la totalidad de la herencia.

Al momento en que el notario Salas Davis autenticó el instrumento, no había una declaratoria de herederos ni una escritura de división de herencia. La Sra. Carmen Milagros Gil Torres no era la única heredera, al *restar seis (6) partes alícuotas sin adquirir.* En ningún momento se intentó aclarar esta situación particular.

El alegado engaño no es excusa suficiente ni defensa para eximir de responsabilidad ética a Salas Davis. Según su propia comparecencia, él tenía sus dudas desde que el quejoso le explicó el negocio jurídico.

Salas Davis vio el poder especial a nombre de Edgardo Gil Álvarez, cuyo contenido *in fine* exponía que la finca *no estaba inscrita* y, además, se hacía alusión a que *había que pagar por la adquisición de los derechos y las acciones de otros herederos.* En su defensa, el licenciado Salas Davis aduce que el quejoso Arvelo Toledo lo engañó, pues le manifestó el día antes de otorgarse la escritura que tenía in-

formación de que había sido inscrita y que, si había dudas, él haría el estudio de título correspondiente. Al otro día le informó que había ido al Registro de la Propiedad y todo estaba en orden. Asimismo lo hizo constar Salas Davis en la propia escritura leída por Arvelo Toledo, al otorgarse. Sin embargo, ello contrasta con otro hecho conocido, admitido y consignado por el notario, a saber, que *la propiedad no estaba inscrita*. En su alegato nos admite que le informó al quejoso que, a pesar de sus manifestaciones, "haría constar en la escritura que la propiedad no se encontraba inscrita, como se expresaba en la Escritura de Poder". De la misma manera, el notario nos explica que tanto el apoderado Gil Álvarez como el quejoso le explicaron que Carmen Milagros era la heredera universal al adquirir del único heredero restante, el mismo Edgardo Gil Álvarez, su cuota en la herencia. En la contestación al Informe de la Oficina de Inspección de Notarías Salas Davis admite que tuvo ante sí la escritura de 23 de mayo de 1986 y la Escritura de Poder Especial de 19 de junio de 1992. Surge claramente de estos documentos que Carmen Milagros sólo adquirió de Genoveva Torres Rodríguez la mitad ganancial del bien inmueble. A pesar de este hecho indiscutible, y con pleno conocimiento, el notario indujo a error al consignar en la escritura en cuestión lo siguiente:

> Continúa manifestando el *VENDEDOR* que su mencionada poderdante adquirió el descrito inmueble por compra a DOÑA GENOVEVA TORRES RODRIGUEZ mediante la escritura número treinta y ocho, de fecha veintitrés de mayo del año mil novecientos ochenta y seis, otorgada en Arecibo, Puerto Rico, ante el licenciado CÉSAR VÉLEZ GONZÁLEZ. (Énfasis en el original.) Escritura Núm. 46 de 9 de julio de 1992, págs. 2–3.

El notario autorizó el negocio jurídico, a pesar de que surge del poder que el apoderado Edgardo Gil Álvarez carecía de autoridad para vender una propiedad que no le pertenecía únicamente a la poderdante Gil Torres. Tam-

poco se probó que éste estaba capacitado para representar a los restantes herederos. ¿Por qué se conformó con una simple explicación verbal de Arvelo Toledo, y luego de Gil Álvarez, a los efectos de que todo estaba resuelto por haberse comprado tales participaciones? ¿Por qué no exigió un documento fehaciente a tales efectos? ¿Cómo es posible ahora descansar en un alegado estudio de título de una propiedad que hacía tres (3) semanas no estaba inscrita y que reconoce que sospechó como fatulo? ¿Por qué hacer constar que la propiedad se adquirió mediante una compraventa en escritura, teniendo conocimiento de que no fue así?

## III

 Como jurista, la responsabilidad notarial de hacer las reservas y advertencias legales pertinentes implica una gestión intelectual y una aplicación inteligente de los principios de derecho positivos y jurisprudenciales. Esa función no se da en el vacío; conlleva tomar en cuenta el contenido del negocio y el significado total e integral de las estipulaciones que se han de suscribir y consentir. El mero hecho de hacer constar expresiones conflictivas entre la creencia del notario y lo manifestado por los otorgantes no lo exime de responsabilidad. A pesar de sus sospechas fundadas, Salas Davis se limitó a advertir que verificarían si estaba inscrita a favor de la vendedora, aun sospechando que sería imposible. No surge que haya ilustrado y advertido a las partes sobre la necesidad de liquidar una herencia, la titularidad del caudal y las implicaciones futuras de compraventas y escrituras en ese estado. Tampoco tomó en consideración los efectos que tal escritura podría tener ante terceros y el registro de la propiedad.

El curso notarial apropiado y prudencial era posponer el otorgamiento para aclarar la situación. No podemos re-

frendar una norma que relaje el propósito verdadero de la práctica notarial: *el otorgamiento de instrumentos jurídicamente eficaces y legales.*

No nos cabe duda de que el instrumento en cuestión fue preparado y autorizado en forma descuidada y desprevenida. El notario tuvo suficientes indicadores para desconfiar de la validez del negocio y actuó sin ánimo precavido, confiando en quien admitidamente no podía confiar.[3] No lo exime que consignara en la escritura que su fe descansaba en lo manifestado por los comparecientes. Sabía o debió saber que la realidad no era como se hacía constar.

Ante las circunstancias expuestas, *procede imponer como sanción una suspensión de tres (3) meses del ejercicio de la notaría.*

*Se dictará la correspondiente sentencia.*

---

[3] El notario Salas Davis admite haber tenido problemas con el quejoso Arvelo Toledo. Para el 12 de marzo de 1992, suscribió una escritura de *compraventa* en la cual el quejoso era el comprador, y el mismo día se enteró de que la intención era ocultar un préstamo garantizado con hipoteca, en el que Arvelo Toledo era el acreedor.

Sin pasar juicio sobre el quejoso Arvelo Toledo, contrasta su reclamo y expresión gramatical y ortográfica de 6 de noviembre de 1995 —cuando prepara la queja en que alega "nosotros no tenemos mucha escuela yo primer grado y mi esposa quinto grado de escuela elemental los dos"— con sus expresiones posteriores. Moción Informativa de 4 de enero de 1996 y la Moción para Solicitar Anotación de Rebeldía de 13 de febrero de 1998.