EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> Andrés J. Colberg Trigo | 2006 TSPR 148 <br><br> 169 DPR ____ |

Número del Caso: AB-2003-213

Fecha: 28 de septiembre de 2006

Abogado del Peticionario:

Por Derecho Propio

Oficina del Procurador General:

Lcda. Sylvia Roger Stefani
Procuradora General Auxiliar

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Andrés J. Colberg Trigo

                              AB-2003-213

SENTENCIA

San Juan, Puerto Rico, a 28 de septiembre de 2006

El matrimonio compuesto por el Dr. Natalio Izquierdo y la Sra. Vivian Amieiro radicó una queja ante este Tribunal contra el abogado notario Andrés Colberg Trigo, consistente la misma en que éste, alegadamente, no los asesoró adecuadamente --actuando como notario, en la compra que ellos hicieron de una propiedad, sita la misma en Miramar, San Juan, Puerto Rico-- al no advertirles que dicha propiedad estaba contaminada con asbesto y plomo.

Contestada la queja por el Lcdo. Colberg Trigo --contestación en la que éste alegó haber cumplido en dicho otorgamiento con todo lo exigido por la Ley Notarial de Puerto Rico, Ley Número 75 de 2 de julio de 1987, 4 L.P.R.A. secs.

2001, *et seq.*, y el Reglamento Notarial de Puerto Rico, 4 L.P.R.A. Ap. XXIV, referimos el asunto a la Oficina del Procurador General de Puerto Rico.

En el informe que radicara el Procurador, dicho funcionario concluyó que el Lcdo. Colberg Trigo había incumplido, en específico, con las disposiciones de la Ley Federal para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992, 42 U.S.C sec. 4851, *et seq.*, al no hacerle a los otorgantes las advertencias que la referida pieza legislativa requiere contenga todo contrato de compraventa de una propiedad construida con anterioridad al 1978. Ello no obstante, el Procurador General recomendó que la norma que a esos efectos tuviera a bien establecer el Tribunal fuera de carácter prospectivo, razón por la cual recomendaba el archivo de la queja radicada contra el Lcdo. Colberg Trigo.

Estando en posición de resolver la controversia planteada, así procedemos a hacerlo sin ulterior trámite.

I

Examinada la queja presentada, el Informe radicado por el Procurador General de Puerto Rico y los argumentos planteados en su comparecencia por el Lcdo. Andrés J. Colberg Trigo, estimamos procedente ordenar el archivo y sobreseimiento de la queja presentada contra el mencionado abogado-notario por el matrimonio Izquierdo Amieiro.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López emitió Opinión concurrente. El Juez Asociado señor Fuster Berlingeri no intervino.


                          Aida Ileana Oquendo Graulau
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Andrés J. Colberg Trigo

AB-2003-213

OPINIÓN CONCURRENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 28 de septiembre de 2006

La conducta que da lugar a la presente acción disciplinaria tiene su génesis en una queja presentada ante este Tribunal por el Dr. Natalio Izquierdo y su esposa, la señora Vivian Amieiro, contra el licenciado Andrés Colberg Trigo, por alegado incumplimiento con sus obligaciones como notario al autorizar una escritura de compraventa.[1]

En la queja el referido matrimonio alegó, en síntesis, que el 10 octubre de 2002 compraron una propiedad ubicada en Miramar, San Juan, perteneciente a María del Carmen y María

---

[1] El Lcdo. Andrés Colberg Trigo fue admitido al ejercicio de la abogacía el 25 de enero de 1999 y al ejercicio del notariado el 10 de junio de 1999.

Arredondo Pérez.[2] Específicamente, señalaron que la transacción fue realizada a través de Home Team, corredor de bienes raíces de la parte vendedora, y que la escritura de compraventa para adquirir dicha propiedad fue otorgada ante el Lcdo. Colberg Trigo. Argumentaron que ni el Lcdo. Colberg Trigo, ni el corredor de bienes raíces, les notificaron antes de comprar la propiedad que la misma estaba contaminada con asbesto y plomo.

Indicaron que, luego de llevada a cabo la compraventa, y debido a que deseaban construir una casa más adecuada a sus necesidades, acudieron a la Administración de Reglamentos y Permisos, A.R.P.E., para solicitar un permiso para demoler la mencionada propiedad. Señalaron que, al así hacerlo, se les notificó que para poder recibir dicha autorización debían realizar un estudio para la detección de materiales tóxicos en la propiedad. Indicaron que, al realizar el estudio, descubrieron que en algunas partes de la propiedad había asbesto y pintura a base de plomo en concentraciones tóxicas. En vista de esa situación, no sólo se retrasó la construcción de su nuevo hogar, sino que previo a comenzar la misma, tuvieron que incurrir en un gasto de más de $117,000 para mitigar y disponer de los referidos materiales tóxicos.

---

[2] Surge de una tasación, que consta en el expediente de autos, realizada a dicha propiedad el 23 de septiembre de 2002 que el inmueble fue construido en el año 1947.

Argumentaron que habían sido informados que los compradores de cualquier propiedad construida antes del año 1978 tenían que ser notificados --ya fuera como parte de las advertencias pertinentes dentro de la escritura de compraventa o mediante una declaración de información sobre la pintura y/o peligros de la pintura a base de plomo-- sobre la posibilidad de encontrar dichos materiales tóxicos en la estructura que iban a adquirir. Adujeron que, si antes de firmar la escritura de compraventa, el Lcdo. Colberg Trigo y/o el corredor de bienes raíces les hubiesen notificado lo anterior, hubieran tenido la oportunidad de tomar una decisión, informada e inteligente, en cuanto a la compra del inmueble. Por último, plantearon que la omisión en la notificación de la existencia de los aludidos materiales, de parte del Lcdo. Colberg Trigo, pudo haberse debido al parentesco de éste con las vendedoras del inmueble o a su falta de conocimiento sobre este aspecto.

Oportunamente, el licenciado Colberg Trigo presentó su oposición a la referida queja. Alegó, en síntesis, que en el antes mencionado otorgamiento cumplió a cabalidad con lo exigido por nuestro ordenamiento jurídico a través de la Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987, 4 L.P.R.A. § 2001 *et seq.*, y el Reglamento Notarial de Puerto Rico, 4 L.P.R.A. Ap. XXIV. Argumentó que el notario no era un ingeniero o inspector de las propiedades objeto de una compraventa, por lo cual,

desconociendo tal situación, no podía ser responsable por los materiales tóxicos presentes en las mismas. A esos efectos, sostuvo que tal hipótesis sería una ampliación improcedente de lo que es la responsabilidad notarial y el ejercicio del notariado.

De otra parte, argumentó el Lcdo. Colberg Trigo que si la verdadera intención de los querellantes era demoler la propiedad en cuestión, pudieron haber sido más diligentes, antes de adquirirla, realizando las investigaciones necesarias para tal propósito. Asimismo, indicó que la compraventa del inmueble se realizó por un precio muy por debajo de tasación y que los propios compradores acordaron que todas las reparaciones necesarias a la propiedad serían realizadas por su cuenta.

Señaló, además, el abogado que los compradores eran residentes de Miramar, razón por la cual debían conocer las residencias y la historia de dicha comunidad. Adujo, por otro lado, que de haber conocido las condiciones tóxicas de la propiedad, jamás hubiera guardado silencio al respecto. Cónsono con ello, destacó que de haber conocido tal situación no hubiera permitido que las vendedoras, siendo sus parientes, vivieran tantos años en una propiedad contaminada. Finalmente, aclaró que las vendedoras eran parientes suyos fuera del cuarto grado de consanguinidad, por lo que no existía contravención o impedimento legal alguno para que él pudiera autorizar la antes mencionada escritura.

Referimos el asunto al Procurador General de Puerto Rico. Éste radicó un informe con sus hallazgos y recomendaciones.[3] En dicho informe, el Procurador General indicó que, en su criterio, el Lcdo. Colberg Trigo había incurrido en violaciones a varios de los deberes impuestos a todo notario por nuestro ordenamiento jurídico; ello en vista de que incumplió con lo requerido por la Ley Federal para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992, "Residential Lead-Paint Hazard Reduction Act", 42 U.S.C. § 4851 *et seq.*, --pieza legislativa que, como profesional del Derecho, el Lcdo. Colberg Trigo tenía la obligación de conocer-- al no incluir las advertencias que el referido estatuto federal requiere contenga todo contrato de compraventa de una propiedad construida antes de 1978.

Específicamente, señaló el Procurador que el aludido estatuto federal estableció varios requisitos con los cuales todo vendedor, arrendador o agente tenía que cumplir[4], a saber: (1) divulgación a los compradores y arrendatarios de la presencia de pintura a base de plomo

---

[3] En su informe el Procurador General se <u>limitó</u> a discutir el planteamiento de los quejosos a los efectos del deber que como notario tenía el Lcdo. Colberg Trigo de realizar las advertencias con respecto a que la propiedad objeto de la compraventa estaba contaminada con plomo.

[4] Vale la pena señalar que para efectos de dicho estatuto *agente* significa aquella parte que contrata con un vendedor o arrendador con el propósito de vender o arrendar las residencias sujetas a la ley, a saber, como regla general, aquellas construidas antes de 1978. 24 C.F.R. § 35.86.

y/o de los peligros de ésta en viviendas construidas antes del año 1978; (2) proveer a los compradores y arrendatarios un panfleto preparado por la Environmental Protection Agency (EPA por sus siglas en inglés) conteniendo información sobre la pintura a base de plomo; y (3) la concesión a los compradores de un periodo de diez (10) días para que tuvieran la oportunidad de inspeccionar la propiedad. 42 U.S.C. § 4852d(1)y(2). Dicho estatuto requiere, por otro lado, que en todo contrato de compraventa se incluya una aseveración específica con respecto a que efectivamente se cumplió con lo anterior. 42 U.S.C. § 4852d(2) y (3).

Indicó, además, el Procurador que por mandato expreso de la referida pieza legislativa, el Departamento de la Vivienda y Desarrollo Urbano de los Estados Unidos, en adelante HUD por sus siglas en inglés, y la Environmental Protection Agency (EPA), promulgaron conjuntamente unas reglas específicas para asegurarse que los compradores y arrendatarios de viviendas construidas antes del 1978 recibieran toda la información necesaria para proteger a sus familias de los peligros de la pintura a base de plomo.[5] Conforme a dicho mandato, se aprobró la Regla de la Divulgación, *"Disclosure Rule"*, por medio de la cual se exige que todo contrato de compraventa incluya un anejo con la siguiente información: (1) un aviso sobre la

---

[5] En específico, Puerto Rico forma parte de la Región 2 de la EPA.

peligrosidad del plomo y la obligación del vendedor de divulgar cualquier información al respecto; (2) una declaración del vendedor divulgando su conocimiento sobre la presencia de pintura a base de plomo y cualquier información disponible al respecto, o indicando que carece de dicho conocimiento; (3) una lista de cualquier documento o informe entregado al comprador sobre la presencia de pintura a base de plomo en la residencia; (4) una declaración del comprador confirmando el recibo de esta información; (5) una declaración del comprador indicando que se le ha otorgado la oportunidad de hacer una evaluación de riesgo de pintura a base de plomo o que ha renunciado a la misma; (6) si hay un agente representando al vendedor en la transacción, una declaración de que el agente está al tanto de su deber de asegurar el cumplimiento de las mismas; y (7) la firma de todas las partes con la fecha en que firmaron. 24 C.F.R. § 35.86.

Conforme a lo anteriormente expuesto, el Procurador General señaló que el Lcdo. Colberg Trigo, al autorizar una escritura de compraventa respecto a una propiedad construida en el 1947 --edificación, naturalmente, anterior al año 1978--tenía la obligación de incluir la aseveración y documentación exigida por la antes mencionada reglamentación federal.[6] Al no hacerlo, conforme

---

[6] Al llegar a la referida conclusión el Procurador General destacó que, aun cuando por disposición expresa del

(Continúa . . .)

señaló el Procurador, éste incurrió en violaciones tanto a los Artículos 2 y 15 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. § 2002 y 2033, como a los Cánones 35 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, C.35 y C.38. Específicamente, indicó el Procurador que el Lcdo. Colberg violó: (1) el deber de darle a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendieran el sentido, así como los efectos y consecuencias del negocio que iban a llevar a cabo y se dieran cuenta de los riesgos que corrían al celebrarlo; y (2) el deber de asegurarse que el negocio jurídico que se efectuaba ante él cumplía con las formalidades de ley, formales y sustantivas.

Debe enfatizarse el hecho de que el Procurador General, en virtud de que este Tribunal nunca se ha expresado sobre este asunto, recomendó que se <u>archivara</u> la queja de autos y se <u>impusiera prospectivamente</u> el deber de todo notario de cumplir con la referida reglamentación federal.[7]

---

aludido estatuto federal, el incumplimiento con las disposiciones de dicha ley no anulaba el negocio jurídico de la compraventa, <u>esta situación no descartaba la responsabilidad de todo notario de cumplir con los requisitos de la misma</u>.

[7] En vista de que en el presente caso <u>no</u> existe controversia alguna sobre los hechos, no hubo necesidad alguna de designar un Comisionado Especial para que recibiera la prueba que tuvieran a bien presentar las partes y éste nos rindiera un informe. *In re* Davison Lampón, res. el 12 de mayo de 2003, 2003 T.S.P.R. 92; *In re* Irrizary, González, 151 D.P.R. 916, 918 (2000).

En el día de hoy, el Tribunal ordena el archivo y sobreseimiento de la queja presentada contra el Lcdo. Colberg Trigo. Estamos de acuerdo con dicho resultado; <u>ello por los fundamentos, que a continuación pasamos a exponer, los cuales lamentablemente una mayoría de los integrantes del Tribunal no apoyan.</u>

I

Como es sabido "[l]a profesión de la abogacía está revestida de un alto interés público que requiere de una estricta observancia y reglamentación". *In re* Montalvo Guzmán, res. 20 de mayo de 2005, 2005 T.S.P.R. 82. Particularmente, <u>en su función como notarios</u>, los abogados "tiene[n] una gran responsabilidad con la fe pública notarial y una estricta obligación de cumplir cabalmente con la ley que regula sus funciones". *Ibid*. Así pues, los notarios tienen el deber de llevar a cabo su función con cuidado, ejerciéndola con sumo esmero y celo profesional. *In re* Davison Lampón, ante; *In re* González Maldonado, 152 D.P.R. 871, 926 (2000); *In re* Vera Vélez, 148 D.P.R. 1, 7 (1999); *In re* Torres Olmeda, 145 D.P.R. 384 (1998).

En armonía con lo anteriormente expresado, este Tribunal ha expresado que, en el ejercicio de su función, los notarios están obligados a cumplir rigurosamente con lo dispuesto en la Ley Notarial de Puerto Rico, ante, con los Cánones de Ética Profesional, 4 L.P.R.A Ap. IX, y con el contrato entre las partes. *In re* Davison Lampón, ante;

véase, además, *In re* Aponte Berdecía, res. el 22 de enero de 2004, 2004 T.S.P.R. 24; *In re* Vera Vélez, ante, a la pág. 7. De lo contrario, se exponen no sólo a una acción de daños por los perjuicios causados, sino, a su vez, a las sanciones disciplinarias correspondiente. *In re* Davison Lampón, ante; *In re* González Maldonado, ante, a la pág. 895; *In re* Vélez, 103 D.P.R. 590 (1975); *In re* Vera Vélez, ante; *In re* Albizu Merced, 136 D.P.R. 126, 131 (1994).

### A.

La ley Notarial de Puerto Rico, ante, le impone al notario una función dual. Por un lado, el notario sirve como agente instrumental del documento notarial; por el otro, es un profesional del Derecho con el deber de asesorar y aconsejar legalmente a los otorgantes. *In re* Colón Rivera, res. el 30 de junio de 2005, 2005 T.S.P.R. 1007, citando a *In re* Colón Ramery, 133 D.P.R. 555 (1993). Conforme a ello, la referida pieza legislativa establece una enumeración de las funciones inherentes que ejercerá todo notario en el descargo de su desempeño profesional. *In re* Tosado Arocho, res. el 5 de septiembre de 2002, 2002 T.S.P.R. 124.

Específicamente, y en lo aquí pertinente, el Artículo 2 de dicha Ley, ante, consagra el principio de la fe pública notarial. A esos efectos, dicho Artículo establece que:

> El notario es el profesional del Derecho que ejerce una función pública, autorizado para dar fe y autenticidad <u>conforme a las leyes de los negocios jurídicos</u> y demás actos y hechos extrajudiciales que ante él se realicen, sin perjuicio de lo dispuesto en las leyes especiales. Es su función recibir e interpretar la voluntad de las partes, dándole forma legal, redactar las escrituras y documentos notariales a tal fin y conferirle[s] autoridad a los mismos. La fe pública al notario es plena respecto a los hechos que, en el ejercicio de su función personalmente ejecute o compruebe y también respecto a la forma, lugar, día y hora del otorgamiento.

Surge de la antes citada disposición, que el notario es el custodio de la fe pública, la cual, según hemos señalado, es "la espina dorsal de todo el esquema de autenticidad documental". <u>Feliciano Caraballo</u> v. <u>Ross Tuggo</u>, res. el 15 de septiembre de 2005, 2005 TSPR 133; *In re* <u>Aponte Berdecía</u>, ante; *In re* <u>Rivera Vázquez</u>, res. el 10 de octubre de 2001, 2001 TSPR 138; *In re* <u>González Maldonado</u>, ante; *In re* <u>Jiménez Brackel</u>, 148 D.P.R. 287 (1999); *In re* <u>Peña Clos</u>, 135 D.P.R. 590 (1994); *In re* <u>González González</u>, 119 D.P.R. 496 (1987). Conforme a lo anterior, el notario --<u>siendo el conocedor del Derecho</u>-- al autorizar un documento "presuntamente da fe y asegura que ese documento cumple con todas las formalidades de ley, formal y sustantivamente, que el documento es legal y verdadero, y que se trata de una transacción válida y legítima". *In re* <u>González Maldonado</u>, ante, a la pág. 895; véase, además, *In re* <u>Aponte Berdecía</u>, res. el 22 de enero de 2004, 2004 TSPR 24; *In re* <u>Davison Lampón</u>, ante; *In re* <u>Rivera Alvelo y Ortiz Velázquez</u>, 132 D.P.R. 840, 863

(1993); *In re* Feliciano Ruiz, 117 D.P.R. 269, 275 (1986). Así pues, hemos establecido que, entre otras cosas, "la función del notario comprende el asegurarse de la legalidad de toda transacción que ante él se concreta". *In re* Davison Lampón, ante; *In re* Criado Vázquez, ante.

Asimismo, y según establece el referido Artículo, en dicha transacción el notario "es quien recibe e interpreta la voluntad de los otorgantes, le da forma legal, redacta los documentos notariales a tal fin y les confiere autoridad". *In re* Davison Lampón, ante. Cónsono con lo anterior, este Tribunal ha establecido que todo notario tiene cuatro deberes principales al autorizar una escritura pública; a saber: (i) indagar la voluntad de los otorgantes; (ii) formular la voluntad indagada; (iii) investigar sobre ciertos hechos y datos importantes; y (iv) darles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo. Véase: *In re* Davison Lampón, ante; Chévere v. Cátala, ante, a la pág. 438.

En específico, hemos destacado una y otra vez la función del notario "de asesorar y advertir sobre los aspectos legales del instrumento que ante él se otorgan y que éste autoriza". *In re* Colón Rivera, ante. A esos efectos, hemos indicado que en nuestro ordenamiento jurídico el notario no es un "simple observador del

negocio jurídico que ante él se realiza limitando su actuación a cerciorarse de la identidad de partes y autenticidad de las firmas". *In re* Fernández de Ruiz, res. el 21 de abril de 2006, 2006 T.S.P.R. 73; *In re* del Río Rivera y Otero Fernández, 118 D.P.R. 339, 347 (1987); *In re* Meléndez Pérez, 104 D.P.R. 770, 774-775 (1976). De este modo, hemos expresado que la función del notario, por ser pública y no privada, trasciende a la de ser un autómata legalizador de firmas y penetra al campo de legalidad de la transacción concreta ante él. *Ibid*.

En virtud de lo anterior, el notario no puede "limita[r] su intervención rutinaria a leer o dar a leer el documento a los otorgantes y asegurarse de la identidad de sus personas y firmas, en un ritual aséptico pero vacío de la inteligencia y comprensión de los firmantes". *In re* Fernández de Ruiz, ante; *In re* del Río Rivera y Otero Fernández, ante, a las págs. 347-348; véase, además, *In re* Candió Sifre, 106 D.P.R. 386, 396-397 (1977). Lo anterior implica que, "en su deber de ilustrar y dar consejo legal a las partes contratantes, no exista guardarraya que separe al notario del abogado". *In re* Davison Lampón, ante; *In re* Meléndez Pérez, ante, a la pág. 775.

Es más, este Tribunal ha ido más allá al "exigirle al notario que, en virtud del entrenamiento legal que posee, ejerza una función previsora frente a aquellos que ante él comparecen". *In re* Davison Lampón, ante; Rodríguez Sardenga v. Soto Rivera, 108 D.P.R. 733, 741 (1979). Lo

antes expuesto necesariamente significa que el notario no sólo debe conocer la norma --exigencia de todo jurista-- sino que, además, debe saber interpretarla e integrarla en el plano general del ordenamiento jurídico que sólo el profesional del Derecho está en condiciones de hacer. *In re Davison Lampón*, ante; Juan-Francisco Delgado de Miguel, *La función Notarial*, II Revista Jurídica del Notariado, pág. 235 (1993). A tales efectos, hemos sostenido que, como profesional del Derecho, el notario tiene la obligación no sólo de conocer sino de mantenerse al día y seguir las leyes, la doctrina, las costumbres y la jurisprudencia. Véase: *In re* Davison Lampón, ante; *In re* Feliciano Ruiz, 117 D.P.R. 269, 275 (1986).

Cónsono con el antes mencionado deber de ilustrar a los otorgantes para lograr que éstos concurran al acto notarial en un estado de conciencia informada, se encuentra la obligación de "cerciorarse de hacerles a las partes todas aquellas explicaciones, aclaraciones y advertencias necesarias para lograr el consentimiento informado de los otorgantes", el cual se establece en el Artículo 15 de la Ley Notarial de Puerto Rico, ante.[8]

---

[8] A tales efectos, el Artículo 15 de la Ley Notarial, ante, establece en lo aquí pertinente que:

> La escritura pública, en adición al negocio jurídico que motiva su otorgamiento y sus antecedentes y a los hechos presenciados por el notario en la parte expositiva y dispositiva contendrá lo siguiente:
> …

(Continúa . . .)

Feliciano Caraballo v. Ross Tuggo, res. el 15 de septiembre de 2005, 2005 TSPR 133; *In re* Pizarro Colón, 151 D.P.R. 94, 106 (2000); *In re* Jiménez Brackel, 148 D.P.R. 287 (1999); véase Artículo 15(f) de la Ley Notarial, ante; Sarah Torres Peralta, El Derecho Notarial Puertorriqueña, San Juan, Publicaciones STP, Inc., 1995, pág. 1.19 (1995). El referido deber, también, implica una gestión intelectual y una aplicación inteligente de los principios de derecho positivos y jurisprudenciales. *In re* Salas Davis, 145 D.P.R. 539, 544 (1998).

Dicha obligación cumple el propósito de que los otorgantes comprendan el sentido, así como los efectos y consecuencias, del negocio jurídico que van a llevar a cabo, y se den cuenta de los riesgos que corren al celebrarlo. Véase: *In re* Fernández de Ruiz, ante; Chévere v. Cátala, 115 D.P.R. 432, 438 (1984). Lo anterior es requerido debido a que "[l]a fe pública notarial tiene como base la voluntad ilustrada de los contratantes"; por lo cual no puede ser fruto de la ignorancia y la oscuridad. *Ibid*; véanse, además, *In re* Jiménez Brackel, 148 D.P.R. 287, 295 (1999); *In re* Meléndez Pérez, ante, a las págs. 775-776.

---

(f) El haberles hecho de palabra a los otorgantes en el acto del otorgamiento las reservas y advertencias legales pertinentes. No obstante, se consignarán en el documento aquellas advertencias que por su importancia deban, a juicio prudente del notario, detallarse expresamente.

B.

De otra parte, y como es sabido, los Cánones de Ética Profesional constituyen un compromiso constante para con la sociedad puertorriqueña. Éstos "enuncian los deberes de respeto y profesionalismo que debe[n] caracterizar a todo jurista y letrado en el desempeño de su trabajo frente a sus clientes y colegas ante todo foro en que ejerza". *In re Clavell Ruiz*, 131 D.P.R. 500, 508 (1992). En lo aquí pertinente, el Canon 18 de Ética Profesional, 4 L.P.R.A. Ap. IX, C.18, impone a los miembros de la clase togada la obligación de desempeñar la profesión cabal y responsablemente, particularmente con respecto a la tramitación de los asuntos que le han sido encomendados. *In re Roldós Matos*, res. el 17 de marzo de 2004, 2004 T.S.P.R. 40. A tales efectos, "es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estime adecuada y responsable" *In re Alonso Santiago*, ante; véase, además, *In re Roldós Matos*, ante; *In re Flores Ayffan*, ante, a la pág. 913; *In re Maduro Classen*, 137 D.P.R. 426, 430-431 (1994); *In re Vela Colón*, 144 D.P.R. 581, 585 (1997); *In re Rivera Maldonado*, 143 D.P.R. 877, 879-880 (1997); *In re Vélez Valentín*, ante, a la pág. 408.[9]

---

[9] El Canon 18, ante, establece, en lo aquí pertinente, que:

(Continúa . . .)

Específicamente, este Tribunal ha establecido que, a pesar de que el antes mencionado Canon 18 requiere que el abogado rinda una labor idónea de competencia y diligencia con relación a los asuntos de su cliente, las aludidas exigencias se extienden a las funciones del jurista como notario. Véase: *In re* González Vélez, ante; *In re* Cardona Ubiñas, ante; *In re* González Maldonado, ante; *In re* Martínez Ramírez, 142 D.P.R. 329, 340-341 (1997). Conforme a lo anterior, el notario debe, "con relación a los documentos que se otorgan ante él, ser diligente y desplegar en cada caso su más profundo saber y habilidad". *In re* Albizu Merced, ante, a las págs. 131-132. Concretamente, hemos indicado que contraviene el Canon 18 el notario que contraviene la ley vigente, incurriendo en una práctica notarial indeseable, y aquel que en el descargue de su función deja de actuar con el cuidado, diligencia, tesón y responsabilidad que le compete en el ejercicio de su ministerio. *In re* Aponte Berdecía, ante; *In re* Rivera Arvelo, 132 D.P.R. 840 (1993); véase, Sarah

---

Será impropio de un abogado asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea competente y que no puede prepararse adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia.

Es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable.

Torres Peralta, El Derecho Notarial Puertorriqueño, a la pág. 4.28 (1995).

Por otra parte, el Canon 35 de los de Ética Profesional, 4 L.P.R.A. Ap. IX C.35, impone a los abogados "un deber de sinceridad y honradez ante los tribunales, frente a sus representados y al relacionarse con sus compañeros de profesión". In re Martínez, Lawrence Odell, 148 D.P.R. 49, 53 (1999); véase, además, In re Soto Colón, res. el 9 de noviembre de 2001, 2001 TSPR 166. A tales efectos, el referido Canon 35 establece, en lo aquí pertinente, que no es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgador a error utilizando artificios o una falsa relación de los hechos o del derecho. In re Silvaglioni Collazo, res. el 29 de junio de 2001, 2001 TSPR 106; véase, además, In re Águila López, 152 D.P.R. 49, 52-53 (2000).

Con respecto a las obligaciones consagradas en el Canon 35, hemos expresado, en innumerables ocasiones, que las mismas constituyen "normas mínimas de conducta que sólo pretenden preservar el honor y la dignidad de la profesión". In re Ortiz Martínez, res. el 6 de abril de 2004, 2004 TSPR 66; In re Collazo Sánchez, res. el 30 de junio de 2003, 2003 TSPR 128; In re Montañez Miranda, res. el 18 de junio de 2002, 2002 TSPR 122; In re Soto Colón, ante; In re Criado Vázquez, res. el 29 de octubre de 2001, 2001 TSPR 154. Por tal razón, el abogado no sólo debe

observarlas durante un pleito, sino en <u>toda</u> faceta en la cual se desenvuelva. *In re* Soto Colón, ante; *In re* Collazo Sánchez, ante; *In re* Criado Vázquez, ante; *In re* <u>Belk Arce</u>, 148 D.P.R. 686, 691 (1999).

Por su parte, el Canon 38 del Código de Ética Profesional, ante, extiende la antes mencionada "obligación de los abogados de conducirse en forma digna y honrada, a su vida privada".[10] *In re* <u>Quiñónez Ayala</u>, res. el 30 de junio de 2005, 2005 T.S.P.R. 99; *In re* <u>Soto Colón</u>, ante; *In re* <u>Silvaglioni Collazo</u>, ante. Todo ello debido a que como hemos señalado "[c]ada abogado es un espejo en que se refleja la imagen de la profesión, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen". *In re* <u>Quiñónez Ayala</u>, ante; *In re* <u>Silvaglioni Collazo</u>, ante; *In re* <u>Ortiz Brunet</u>, 152 D.P.R. 542, 556 (2000); *In*

---

[10] El Canon 38, establece, en lo aquí pertinente que:

> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redunden en beneficio de la profesión…

> Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable…

*re* Coll Pujols, 102 D.P.R. 313, 319 (1974). Específicamente, este Tribunal ha establecido que otorgar un documento notarial en contravención de la Ley Notarial de Puerto Rico, ante, constituye una violación al Canon 38. Véase: *In re* Vera Vélez, ante.


II

De particular relevancia al presente caso resulta ser la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales, "Residential Lead-based Paint Hazard Act", 42 U.S.C. § 4851 *et seq.*[11] Dicho estatuto fue aprobado en el 1992 por el Congreso de los Estados Unidos en respuesta a varios hallazgos sobre los efectos nocivos del plomo en el ser humano, particularmente, en los niños menores de seis años[12]. 42 U.S.C. § 4851. Véase, Mason v. Morrisette, 403

---

[11] La referida pieza legislativa fue codificada en el Título X de la Ley de Vivienda y Desarrollo de Comunidades, "Housing and Community Development Act", de 1992. Pub. L. No. 102-550, 106 Stat. 3672 (1992).

[12] A través de esta Ley, el Congreso reconoció que el envenenamiento por plomo era una amenaza para los niños menores de 6 años y enfatizó en las necesidades de esta población vulnerable. 42 U.S.C. § 4851; véase, además, Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01. Específicamente, se descubrió que, en bajos niveles, el envenenamiento por plomo en los niños provoca, entre otras cosas, deficiencias en el coeficiente intelectual, incapacidad de lectura y aprendizaje, deterioro de la audición, déficit de atención, hiperactividad y problemas de comportamiento. Asimismo, se encontró que en los niños la causa más común de este tipo de envenenamiento era ingerir polvo de pintura a base de

(Continúa . . .)

F.3d 28, 30 (1st. Cir. 2005); National Multi Housing Council v United States Environmental Protection Agency, 292 f 3d. 232, 233 (D.C. Cir. 2002); Sweet v. Sheahan, 235 F.3d 80, 83-84, (2nd. Cir. 2000); véanse, además, Claude E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, 8 Buff. Envtl. L.J. 65, 68 (2000); Shana R. Cappell, Lead Paint Poisoning and the Resource Conservation and Recovery Act: A New Partnership for the Twenty-First Century, 35 Colum. J.L. & Soc. Probs. 175, 179 (2002).

La referida pieza legislativa se aprobó, entre otras, con la intención de establecer la infraestructura necesaria para reducir rápidamente los peligros de la pintura a base de plomo en las residencias y para enfrentar la necesidad de controlar la exposición de los ciudadanos a estos peligros. 42 U.S.C. § 4851a(1); Mason v. Morrisette, ante, a la pág. 30; Sweet v. Sheahan, ante, a la pág. 84. Se aprobó, además, con el objetivo de educar al público sobre los peligros y orígenes del envenenamiento por la pintura a base de plomo y sobre los pasos para poder reducir y eliminar estos riesgos. 42 U.S.C. § 4852a(7); Mason v. Morrisette, ante, a la pág. 30.

Específicamente, se dispuso que las residencias o viviendas objeto de la legislación, "target housing",

_____

plomo deteriorada o desgastada en sus hogares. Sección 1002 del Título X, 42 U.S.C. § 4851.

eran, como regla general, aquellas propiedades construidas antes de 1978.[13] 42 U.S.C. § 4851b(27); 24 CFR § 35.86; 40 CFR § 745.103. Ello en vista de que ese fue el año en que la Comisión para la Seguridad de los Productos de Consumo, *Consumer Product Safety Commission*, prohibió el uso de la pintura a base de plomo. National Multi Housing Council v United States Environmental Protection Agency, 292 f 3d. 232, 233 (D.C. Cir. 2002); véanse, Claude E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, ante, a la pág. 71; Katherine A. Pancak et al., Legal Duties of Property Owners Under Lead Based-Paint Laws, 24 Real Est. L.J. 7, 8 (1995); Nicolas M. Kublicki, Heavy Metal: Residential Lead Rule, 10 Prob. & Prob. 38, 40 (Sept./Oct. 1996).

De otra parte, se excluyeron de la aplicación de esta legislación: (1) viviendas para personas de edad avanzada (a menos que resida o se espere resida un niño menor de 6 años); (2) viviendas para incapacitados; (3) viviendas de 0 cuatros; y (4) alojamiento comercial. Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based

---

[13] Para fines del referido estatuto "target housing" se define, en lo aquí pertinente, de la siguiente manera:

"The term "target housing" means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing for the elderly or persons with disabilities) or any 0-bedroom dwelling…" 42 U.S.C. § 4851b(27); 24 CFR § 35.86; 40 CFR § 745.103.

Saint Hazard in Housing, 61 FR 9064-01, 9066; John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 16; Nicolas M. Kublicki, Heavy Metal: Residential Lead Rule, ante, a la pág. 40.[14]

Para lograr los objetivos de esta medida, se requirió, en lo aquí pertinente, que la EPA y HUD promulgaran una regulación conjunta para asegurar que los compradores y arrendatarios de viviendas objeto de la legislación estuvieran recibiendo toda la información necesaria para proteger a su familias de los peligros de la pintura a base de plomo. 42 U.S.C. § 4852d(a)(1); Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01,

---

[14] De igual forma, se excluyeron de cumplir con los requisitos de esta legislación ciertas transacciones aun cuando estuviesen envueltas propiedades construidas antes de 1978. A esos efectos, se excluyeron: (1) las transacciones de ventas de propiedades en ejecuciones de hipoteca; (2) arrendamientos de residencias que estuviesen, según determinado por un inspector, libres de pintura a base de plomo; (3) arrendamientos de 100 días o menos, donde no pudiese ocurrir una renovación o extensión en el contrato; (4) renovación de arrendamientos, en los cuales se ha divulgado la información anteriormente y ninguna información nueva ha entrado en posesión del arrendador; (5) compra, venta o servicio de hipotecas; (6) venta o arrendamiento de viviendas de 0 cuatros; y (7) acuerdos informales de alquiler. 24 CFR § 35.82; 40 CFR § 745.101; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9066-68; véase, además, Claude E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, ante, a las págs. 79-80; John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 16; Nicolas M. Kublicki, Heavy metal: Residential Lead Rule, ante, a la pág. 40.

9064; véase <u>National Multi Housing Council</u> v <u>United States Environmental Protection Agency</u>, ante, a la pág. 233; <u>Sweet</u> v. <u>Sheahan</u>, ante a la pág. 84; véanse, además, John P. Fensler & Leonard A. Bernstein, <u>Lead Poisoning at Home: New Federal Disclosure Duties</u>, 26 Real Est. L.J. 7 (1997); Nicolas M. Kublicki. <u>Heavy metal: Residential Lead rule</u>, ante, a la pág. 39.

Ahora bien, y no obstante haber requerido lo anterior de las referidas agencias, mediante el mencionado estatuto el Congreso estableció unos parámetros con respecto a qué tipo de información obligatoriamente tenía que ser divulgada a todo comprador o arrendatario de una propiedad construida antes de 1978 antes de que estuviera contractualmente obligado por un contrato de compraventa o arrendamiento.[15] A esos efectos, se exigió que los vendedores y arrendadores les proveyeran a éstos un folleto informativo preparado por la EPA sobre los peligros del plomo[16] y les divulgaran su conocimiento sobre la presencia de pintura a base de plomo o de sus peligros en la propiedad, proveyéndoles cualquier informe o

---

[15] Conforme a lo anterior, nos referiremos a la persona que desea comprar una propiedad construida antes de 1978 como prospecto comprador ello en vista de que el aludido estatuto ordena que la divulgación de la información requerida se lleve a cabo antes de que éste se encuentre contractualmente obligado con el vendedor. <u>Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing</u>, 61 FR 9064-01, 9071.

[16] Dicho panfleto de la EPA se titula "Proteja a su Familia Contra el Plomo en el Hogar".

evaluación que tuvieran disponible. 42 U.S.C. § 4852d(a)(1). Particularmente, a los vendedores de dichas propiedades se les requirió que le proveyeran a los prospectos compradores un período de 10 días --o aquel período que mutuamente acordaran-- para que tuvieran la oportunidad de realizar una inspección o evaluación para la detección de los peligros de la presencia de pintura a base de plomo en la residencia objeto de venta. 42 U.S.C. § 4852d(a)(1).[17]

Es preciso señalar que el vendedor tiene que cumplir con lo anterior, antes de aceptar la oferta del prospecto comprador, ello con el propósito de que el prospecto comprador tenga la oportunidad de revisar la información y posiblemente enmendar la oferta. Lead; Requirements for

---

[17] Vale la pena señalar que aun cuando, en términos generales, esta ley impuso una obligación a todo vendedor de una propiedad construida antes de 1978 de divulgar cierta información que fuera de su conocimiento con respecto a la existencia de pintura a base de plomo o de sus peligros en su propiedad, no impuso una obligación afirmativa de llevar a cabo una inspección de la propiedad o de llevar a cabo una actividad de reducción o eliminación de la exposición a los peligros de la pintura a base de plomo. John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 15. Katherine A. Pancak, et al., Legal Duties of Property Owners under Lead-Based Paint Laws, ante, a la pág. 16 y 18; Nicolas M. Kublicki, Heavy metal: Residential lead rule, ante, a la pág. 40; Rick Reibstein, The Significance of the Federal Residential Lead-Based Paint Regulations, 30 -SUM VT. B.J. 43, 44 (2004).

Ahora bien es de notar que si el dueño de una propiedad desea remover la pintura a base de plomo tiene que contratar a una persona certificada para ello. En específico, en Puerto Rico la Junta de Calidad Ambiental es la agencia encargada de otorgar los permisos y certificaciones en el campo de la remoción de la pintura a base de plomo.

<u>Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing</u>, 61 FR 9064-01, 9071. De este modo, se le notifica al prospecto comprador sobre la posibilidad de que estén presentes en la propiedad los riesgos de la pintura a base de plomo, ofreciéndole la oportunidad para rechazar la transacción o para proceder a realizar el contrato de compraventa con el conocimiento de que existe la posibilidad de que dichos peligros pueden estar presentes en la propiedad que va a adquirir. <u>Mason</u> v. <u>Morrisette</u>, ante, a la pág. 31.

Es de notar que a los agentes de los vendedores y arrendadores se les impuso, a su vez, la responsabilidad de asegurarse de que sus clientes cumplieran con los requisitos de divulgación y notificación establecidos por la ley. 42 U.S.C. § 4852d(a)(4). Los agentes pueden cumplir con esta obligación informando a los vendedores o arrendadores de sus obligaciones y asegurándose que las actividades son completadas ya sea por el vendedor o arrendador o llevándolas a cabo personalmente[18]. Luego de

---

[18] Dicho estatuto define el término agente de la siguiente manera:

> Agent means any party who enters into contract with a seller or lessor, including any party who enters into contract with a representative of the seller or lessor, for the purpose of selling or leasing target housing. This term does not apply to purchasers or any purchaser´s representative who receives all compensation from the purchaser. 24 CFR § 35.86; 40 CFR § 745.103.

(Continúa . . .)

que el agente ha informado al vendedor o arrendador de sus obligaciones de divulgación bajo dicho estatuto, el agente no será responsable por aquella información que el vendedor o arrendador le haya escondido. 24 CFR § 35.94; 40 CFR § 745.115; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9077; Claude E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, ante, a la pág. 75; John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 15; Nicolas M. Kublicki, Heavy metal: Residential lead rule, ante, a la pág. 41.

De otra parte, mediante el mencionado estatuto se exigió que todo contrato de compraventa incluyera un anejo constatando que se cumplieron con los antes mencionados requisitos de divulgación. A tales efectos, específicamente, se requirió que en una hoja de papel aparte --en letra grande y en el mismo idioma del contrato-- se incluyera una Declaración de Advertencia de

---

Conforme a esta definición, son considerados agentes para fines del antes mencionado estatuto, por lo cual están obligados a cumplir con la reglamentación de divulgación federal, todo corredor o vendedor de bienes raíces que enliste una propiedad, que ofrezca una propiedad para su venta o alquiler, o aquel corredor de bienes raíces del comprador (si recibe su compensación del vendedor o a través de un acuerdo de cooperación con el agente que enlistó la propiedad). Ahora bien, un agente del comprador que recibe toda su compensación del comprador no es considerado agente para los efectos de esta legislación. Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9067.

Pintura a Base de Plomo, "Lead Warning Statement"[19].
Asimismo, se requirió que dichos contratos incluyeran una
aseveración del comprador certificando que había leído la
referida declaración, que había recibido el panfleto de la
EPA y que tuvo la oportunidad de realizar una inspección a
la propiedad antes de estar contractualmente obligado con
el vendedor. 42 U.S.C. § 4852d(a)(2); Lead; Requirements
for Disclosure of Known Lead-Based Saint and/or Lead-Based
Saint Hazard in Housing, 61 FR 9064-01, 9064-9065; véase,
Mason v. Morrisette, ante, a la pág. 31; Cudjoe v.
Department of Veterans Affairs, 426 F.3d 241, 245 (3rd.

---

[19] En el estatuto expresamente se estableció cuál sería el
contenido de dicha declaración. A esos efectos, se
estableció, en lo aquí pertinente, lo siguiente:

> The Lead Warning Statement shall contain the
> following text printed in large type on a
> separate sheet of paper attached to the
> contract:
>
> "Every purchaser of any interest in residential
> real property on which a residential dwelling
> was built prior to 1978 is notified that such
> property may present exposure to lead from lead-
> based paint that may place young children at
> risk of developing lead poisoning. Lead
> poisoning in young children may produce
> permanent neurological damage, including
> learning disabilities, reduced intelligence
> quotient, behavioral problems, and impaired
> memory. Lead poisoning also poses a particular
> risk to pregnant women. The seller of any
> interest in residential real property is
> required to provide the buyer with any
> information on lead-based paint hazards from
> risk assessments or inspections in the seller's
> possession and notify the buyer of any known
> lead-based paint hazards. A risk assessment or
> inspection for possible lead-based paint hazards
> is recommended prior to purchase." 42 U.S.C. §
> 4852d(a)(3).

Cir. 2005); Sweet v. Sheahan, ante, a la pág. 84; véanse, además, Katherine A. Pancak, Thomas J. Miceli, C.F. Sirmans, Legal Duties of Property Owners under Lead-Based Paint Laws, ante, a la pág. 15; Nicolas M. Kublicki. Heavy metal: Residential lead rule, ante, a las págs. 40-42; Shana R. Cappell, Lead paint poisoning and the Resource Conservation and Recovery Act: A new partnership for the twenty-first century, ante, a la pág. 180.

En específico, se establecieron, además, penalidades y sanciones significativas por incumplir con los requisitos de divulgación y notificación de la mencionada pieza legislativa. Mason v. Morrisette, ante, a la pág. 31. John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, 26 Real Est. L.J. 7, 17 (1997); Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9077. A tales efectos, se autorizó a la EPA y a HUD a imponer penalidades monetarias civiles por cada violación a la Ley. Más aún, se dispuso que todo vendedor o arrendador que, a sabiendas, violara las disposiciones de esta Ley resultaría responsable civilmente por hasta el triple de la cuantía de los daños causados al comprador, más las costas y honorarios de abogado. 24 CFR § 35.96; 40 CFR § 745.118; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9065. Ahora bien, expresamente se dispuso que el

incumplimiento con las disposiciones de la ley no autorizaba a la rescisión del contrato o a la creación de un defecto en el título de la propiedad. 24 CFR § 35.98; 40 CFR § 745.119; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9078.

Así pues, en virtud del antes mencionado mandato y conforme a los parámetros establecido por dicho estatuto, en 1996 la EPA y HUD aprobaron sus regulaciones conjuntas, mejor conocidas como la Regla de la Divulgación[20], "Disclosure Rule". 24 CFR § 35, según codificado por HUD Y 40 CFR § 745, según codificada por la EPA.[21] Mediante la referida Regla se dispuso específicamente qué información debía ser divulgada y cuál era el lenguaje que todo contrato de compraventa debía contener a esos efectos. De esta forma, se impuso la obligación se certificar y

---

[20] Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01.

[21] Esta Regla fue promulgada el 6 de marzo de 1996. Específicamente, dicha reglamentación comenzó a regir en fechas distintas dependiendo de cuántas propiedades residenciales poseyeran los dueños; a saber, si poseía más de cuatro (4) unidades comenzó a regir el 6 de septiembre de 1996 y si poseía entre una (1) a cuatro (4) comenzó a regir el 6 de diciembre de 1996. 24 CFR § 35.84, 40 CFR § 745.102; véase, además, Claude E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, ante, a la pág. 76; John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 16; Nicolas M. Kublicki. Heavy metal: Residential lead rule, ante, a la pág. 16.

acreditar que se cumplieron con los requisitos de divulgación impuestos por el antes mencionado estatuto.

De este modo, <u>se requirió que todo contrato de compraventa de una propiedad construida antes de 1978 incluyera en el idioma del contrato un documento anejado con los siguientes elementos</u>: (1) la Declaración de Advertencia de Plomo, "Lead Warning Statement"; (2) una aseveración del vendedor divulgando su conocimiento sobre la presencia de pintura a base de plomo y/o de sus peligros en la vivienda o indicando su desconocimiento de la presencia de éstos; (3) una aseveración del vendedor de que ha entregado al comprador una lista de los informes o evaluaciones que tiene disponibles o indicando que no los tiene; (4) un acuse de recibo del comprador afirmando que ha recibido toda la información antes mencionada y el folleto informativo de la EPA sobre los peligros del plomo; (5) una aseveración del comprador de que tuvo un periodo de 10 días (o el periodo acordado entre las partes) para realizar una evaluación o inspección de los peligros de la pintura a base de plomo en la propiedad o, en la alternativa, una aseveración de que ha renunciado a su derecho de realizar la misma; (6) cuando hay un agente envuelto en la transacción tiene que incluirse una afirmación de que éste le informó al vendedor su obligación de cumplir con la regla de divulgación y que está consciente de su deber de asegurarse del cumplimiento con los requerimientos de esta regla; (7) por último, debe

incluirse la fecha y la firma del vendedor, agente, y el comprador certificando la exactitud de las aseveraciones en el anejo. 24 CFR § 35.92; 40 CFR § 745.113; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9072-9073; Katherine A. Pancak et al., Legal Duties of Property Owners under Lead-Based Paint Laws, ante, a la pág. 16.[22]

---

[22] Como parte de la regulación conjunta la EPA y HUD ofrecieron un modelo de cómo debía ser el documento anejado a todo contrato de compraventa de una propiedad construida antes de 1978. Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01. El referido formulario lee como sigue:

**DECLARACIÓN SOBRE LOS PELIGROS DEL PLOMO**
Se notifica a todo comprador de cualquier interés en propiedad real residencial en la cual fue construida una vivienda residencial antes del año 1978, que dicha propiedad puede presentar una exposición a plomo de la pintura a base de plomo que podría poner a niños jóvenes en situación de riesgo de desarrollar envenenamiento de plomo. El envenenamiento de plomo en niños jóvenes puede producir daños neurológicos permanentes, incluyendo incapacidad para el aprendizaje, cociente de inteligencia reducido, problemas de comportamiento y memoria dañada. El envenenamiento de plomo también representa un peligro especial para las mujeres embarazadas. El vendedor (arrendador) de cualquier interés en una propiedad privada real residencial tiene la obligación de proporcionarle al comprador (arrendatario) toda la información que posea sobre los peligros de la pintura a base de plomo que se hayan determinado en evaluaciones o inspecciones de riesgo y de notificarle al comprador (arrendatario) sobre cualquier sobre cualquier peligro que conozca de la pintura a base de plomo antes de la compra.

**DECLARACIÓN DEL VENDEDOR**

(Continúa . . .)

_____

(a) Presencia de pintura a base de plomo y/o peligros e pintura a base de plomo (marque (i) ó (ii) abajo):

    (i) _____ Confirmado que hay pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda. (Explique).

       _____

       _____

    (ii) _____ El vendedor no tiene ningún conocimiento de que haya pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda.

(b) Archivos e informes disponibles para el vendedor (marque (i) ó (ii) abajo):

    (i) _____ El vendedor le ha proporcionado al comprador todos los archivos e informes disponibles relacionados con pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda. (Anote documentos abajo).

       _____

       _____

    (ii) _____ El vendedor no tiene archivos ni informes relacionados con pintura a base de plomo y/o peligros de pintura a base de plomo en la vivienda.

**ACUSE DE RECIBO DEL COMPRADOR (INICIAL)**

(c) _____ El comprador ha recibido copias de toda la información indicada arriba.

(d) _____ El comprador ha recibido el folleto titulado *Proteja a Su Familia del Plomo en Su Casa*.

(e) El comprador ha (marque (i) ó (ii) abajo):

    (i) _____ recibido una oportunidad por 10 días (o un período de tiempo de mutuo acuerdo) para hacer una evaluación o inspección de riesgo de presencia de pintura a base de plomo o de peligros de pintura a base de plomo; o

    (ii) _____ renunciado a la oportunidad de hacer una evaluación o inspección de riesgo de presencia de pintura a base de plomo o de peligros de pintura a base de plomo.

**ACUSE DE RECIBO DEL AGENTE (INICIAL)**

(f) El agente le ha informado al vendedor de las obligaciones de acuerdo con 42 U.S.C. § 4852d y está

(Continúa . . .)

Por último, las referidas agencias le impusieron, la obligación al vendedor, y al agente, de retener copia de este documento por un periodo no menor de tres años desde la fecha de la venta de la propiedad. 24 CFR § 35.92; 40 CFR § 745.113; Lead; Requirements for Disclosure of Known Lead-Based Saint and/or Lead-Based Saint Hazard in Housing, 61 FR 9064-01, 9076; John P. Fensler & Leonard A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, a la pág. 20.

III

De entrada, es preciso señalar que aun cuando la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales, ante, expresamente establece que el incumplimiento con sus disposiciones no vicia el título ni conlleva la anulación del contrato de compraventa, ello no significa, como bien señala el Procurador General, que el Lcdo. Colberg Trigo

---

consciente de su responsabilidad de asegurar su cumplimiento.

**Certificación de Exactitud**
Las partes siguientes han revisado la información que aparece arriba y certifican que, según su entender, toda la información que han proporcionado es verdadera y exacta.

| | | | |
|---|---|---|---|
| Vendedor | Fecha | Comprador | Fecha |

| | |
|---|---|
| Agente | Fecha |

no haya incurrido en violaciones éticas.[23] Por el contrario, un examen de los hechos del presente caso demuestra que su conducta constituyó una violación tanto a los Artículos 2 y 15 de la Ley Notarial de Puerto Rico como a los Cánones 18, 35 y 38 de nuestro Código de Ética Profesional, al no ejercer su profesión con cuidado, diligencia y celo profesional autorizando una escritura de compraventa sin cumplir con lo requerido por dicha ley federal.

El Lcdo. Colberg Trigo alega que requerir el cumplimiento con las disposiciones del aludido estatuto equivale a una aplicación improcedente de lo que es la responsabilidad notarial y el ejercicio del notario. Nada más lejos de la verdad. Como mencionamos anteriormente, y conforme a su deber de asesorar a las partes, el notario --como profesional del Derecho-- tiene la responsabilidad de mantenerse al día con respecto a las leyes que inciden sobre su función notarial. Ello en vista de que "el notario no es un espectador silente que se limita a estar presente irreflexivamente en la ejecución del negocio jurídico que ante él se realiza. Éste tiene la obligación de velar porque todo lo autorizado, bajo su mano revestida

---

[23] Es preciso indicar que el presente asunto se originó en la órbita de nuestra jurisdicción disciplinaria, no en la judicial. En vista de ello, no nos corresponde en esta ocasión dilucidar, como solicitaron los quejosos, si el corredor de bienes raíces en el presente caso incurrió en violaciones a la Ley para la Reducción de los Riesgos Provocados por la Pintura a base de Plomo en Viviendas Residenciales, ante.

por la fe pública, <u>cumpla con lo requerido por la ley</u>".
Véase: *In re* Fernández de Ruiz, res. el 21 de abril de
2006, 2006 T.S.P.R. 73; *In re* González Maldonado, 152
D.P.R. 871, 926 (2000).

De igual forma, "la fe pública notarial le impone al
notario el deber de ser diligente en su gestión y de
asegurarse de cumplir con todas las solemnidades de ley al
autorizar instrumentos públicos". <u>Feliciano Caraballo</u> v.
<u>Ross Tuggo</u>, res. el 15 de septiembre de 2005, 2005 TSPR
133; *In re* Rivera Vázquez, ante. Así pues, no hay duda que
siendo de aplicación en nuestra jurisdicción dicha ley
federal, el Lcdo. Colberg Trigo, como parte de su función
como notario, estaba obligado a conocerla y a cumplir con
sus disposiciones.

Ciertamente el antes mencionado estatuto federal y su
reglamentación afecta y cubre las transacciones de bienes
raíces en Puerto Rico exigiendo que los vendedores,
arrendadores y/o sus corredores o vendedores de bienes
raíces divulgaran a los prospectos compradores o
arrendatarios información adicional sobre sus propiedades.
Asimismo, y en lo aquí pertinente, específicamente impuso
unos requisitos con respecto a los contratos de
compraventa, requiriendo que se incluyera un anejo con un
lenguaje específico.

Somos del criterio que el Lcdo. Colberg Trigo estaba
obligado --como parte de su deber de asesorar a los
otorgantes y de cerciorarse de hacerles las explicaciones

necesarias para que éstos comprendieran los efectos y consecuencias del negocio jurídico que estaban llevando a cabo-- a cumplir con lo requerido por dicha pieza legislativa, incluyendo las aseveraciones, advertencias, y la documentación requerida por la reglamentación federal.

En el presente caso el Lcdo. Colberg Trigo no anejó documento alguno al contrato de compraventa ni se cercioró que en efecto se le hubiese divulgado la información con respecto a los peligros de la pintura a base de plomo a los prospectos compradores, siendo la propiedad objeto de la compraventa una construida antes de 1978. Al no hacerlo, no desplegó su función de notario con cuidado y diligencia incurriendo en una violación del Canon 18 de los de Ética Profesional, ante, y en violación a los Cánones 35 y 38. El Lcdo. Colberg Trigo tampoco se aseguró que el documento que ante él se otorgaba cumpliera con todas las formalidades de ley, formales y sustantivas en violación al Artículo 2 y 15, ante.

Debe mantenerse presente que hemos expresado que "es deber de un notario ilustrar y explicarle la situación a todas las partes envueltas en la transacción; en específico, a los compradores de la propiedad". Véase: *In re* Jiménez Brackel, ante, a la pág. 295 citando a *In re* Delgado, 120 D.P.R. 518, 526 (1988). Ello le brinda la oportunidad a éstos de tomar la decisión que entiendan procedente estando debidamente informados. *Ibid.* El Lcdo. Colberg Trigo, al no cumplir con esta obligación, permitió

que el matrimonio Amieiro-Izquierdo otorgara una escritura de compraventa sin comprender los riesgos y consecuencias del negocio jurídico que estaba llevando a cabo. Así pues, se convirtió en coautor de un consentimiento enfermo, traicionando de esta forma la fe de la que es principal guardador. Véase: *In re* Meléndez, ante, a las págs. 776-777. Surge de lo anteriormente expuesto que el Lcdo. Colberg Trigo con su conducta incurrió en violaciones éticas al no cumplir con lo exigido por la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales, ante.

Considerando que los hechos en el presente caso no son únicos y que, por el contrario se puede tratar de una situación recurrente en perjuicio de nuestros conciudadanos resolveríamos que todo notario que otorgue en nuestra jurisdicción una escritura de compraventa sobre una propiedad residencial inmueble, construida antes del 1978, debería realizar las aseveraciones y advertencias pertinentes y anejar el documento requerido por la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales, ante. Ello no obstante, y siendo la primera vez que este Tribunal se expresaría con respecto a la obligación antes mencionada entendemos razonable la recomendación del Procurador General de que esta norma sea aplicada de forma prospectiva.

Concurrimos, por los fundamentos antes expresados, con la Sentencia mayoritaria que ordena el archivo y sobreseimiento de la queja presentada contra el Lcdo. Andrés Colberg Trigo.


                    FRANCISCO REBOLLO LÓPEZ
                         Juez Asociado